IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 12-02646 |
| | ) | Chapter 7 |
| KENNETH BARRICK, | ) | Hon. Donald R. Cassling |
| | ) | (DuPage County) |
| Debtor. | ) | |
| | ) | |
| FEDERAL DEPOSIT | ) | |
| INSURANCE CORPORATION | ) | |
| as receiver for the Arcola | ) | |
| Homestead Savings | ) | Adv. Pro. No. _____ |
| Bank | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH BARRICK, | ) | |
| | ) | |
| Defendant. | | |

**COMPLAINT OBJECTING TO DISCHARGE AND TO DISCHARGEABILITY
OF OBLIGATION TO THE FEDERAL DEPOSIT INSURANCE CORPORATION**

The Federal Deposit Insurance Corporation as receiver for the Arcola Homestead Savings Bank (**"Arcola"**, and the FDIC acting as receiver for Arcola, the **"Receiver"**) objects to the discharge, and the dischargeability of debts, of the debtor—Kenneth Barrick, M.D.—under 11 U.S.C.§§ 727(a) and 523(a) and Rules 4004 and 4007 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**).

**PARTIES**

1. The Receiver is the involuntary successor of Arcola. The Illinois Department of Professional Regulation - Division of Banking closed Arcola for unsafe and unsound banking practices on June 4, 2010, placed Arcola into receivership, and appointed

the Receiver as receiver for Arcola. Under 12 U.S.C. §1821(d)(2)(A), the Receiver has succeeded to all of Arcola's rights, titles, and interests by operation of law.

2. Dr. Barrick is the debtor in the chapter 7 bankruptcy case identified above.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this adversary proceeds pursuant to 28 U.S.C. §1334.

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (I), (J), and (O).

## FACTS

6. Dr. Barrick defrauded Arcola, and as a result, Arcola lent him, and his co-borrowers, $600,000 (the **"Arcola Loan"**). Dr. Barrick no longer has the $600,000, nor can he account for the disposition of that money.

7. Dr. Barrick involved his co-borrower—and mother—Carrole Collins (**"Collins"**) in his fraud. As a result, she had to file her own chapter 11 bankruptcy case which is pending in the Western District, in Rockford, Illinois under Case No. 10-72658.

**Origination of the Arcola Loan**

8. Dr. Barrick's fraud begins when Collins asked him if he could recommend someone to assist her in securing financing. She was concerned about ensuring there was enough money to provide for her, and her companion, Constance White (**"White"**, together with Dr. Barrick and Collins collectively, the **"Borrowers"**), in their advancing years.

2

9. Dr. Barrick referred Collins and White to Sal DiBenedetto (**"DiBenedetto"**) and suggested that DiBenedetto would be able to assist Collins and White in obtaining a loan. At Dr. Barrick's suggestion, Collins contacted DiBenedetto.

10. In concert with DiBenedetto, Dr. Barrick proposed borrowing money and then investing the loan proceeds. The investment income would then provide an annuity-like stipend for Collins and White. DiBenedetto would manage the loan proceeds, their investment, and ensure payment of a monthly stipend to Collins and White.

11. DiBenedetto told Collins that collectively she and White were not credit worthy and could not qualify of a loan.

12. Because Collins and White could not qualify for a loan on their own, DiBenedetto suggested that Collins ask her son, Dr. Barrick, to co-sign the loan. Dr. Barrick agreed to co-sign. The loan would come from Arcola—the Arcola Loan.

13. In addition to requiring Dr. Barrick as a co-borrower, Arcola required collateral to secure the Arcola Loan. As collateral, Arcola accepted a mortgage against real property located at 321 S. Clark, Elizabeth, IL, the improvements thereon, an the fixtures affixed thereto (collectively, the **"Property"**, and that mortgage, the **"Arcola Mortgage"**, attached as **Exhibit A** to this complaint). The Property is composed of approximately 130 acres. During the time of applying for, and originating, the Arcola Loan, Collins and White lived on the Property as their principal residence.

14. When Dr. Barrick agreed to be co-borrower with Collins and White under the Arcola Loan, he had no intention of repaying the Arcola Loan.

15. Before he could qualify as a co-borrower, Dr. Barrick was required to complete, sign, and submit to Arcola, the Uniform Residential Loan Application dated July 17, 2008 and attached hereto as **Exhibit B** (the **"Application"**).

16. The Application was a writing provided to Arcola and was relied upon by Arcola in making the Loan.

17. The Application was inaccurate in ways that rendered it materially false as identified in more detail in paragraphs 18 through 22 below.

18. On page 1 of the Application, Dr. Barrick identifies the Property as one of his assets, as his secondary residence. But the Property was *not* owned by Barrick's nor was it his secondary residence when he signed the Application. At that time, Dr. Barrick did *not* have any interest in the Property.

19. On page 2 of the Application, Dr. Barrick lists stocks and bonds worth $500,000 among his assets. Upon information and belief, he did *not* hold stocks and bonds worth $500,000 at the time he signed the Application.

20. On page 2 of the Application, Dr. Barrick identifies a vested interest in a retirement fund worth $750,000 among his assets. Upon information and belief, he did *not* hold a vested interest in a retirement fund worth $750,000 at the time he signed the Application.

21. On page 2 of the Application, Dr. Barrick identifies automobiles worth $55,000 among his assets. Upon information and belief, he did *not* own automobiles worth $55,000 at the time he signed the Application.

22. In originating the Arcola Loan and disbursing the Arcola Loan Proceeds to, or for the benefit of, Dr. Barrick, Arcola reasonably relied and materially relied on the

4

Application, including each of Dr. Barrick's representations of assets that he owned as identified in paragraphs18-22. *See* **Exhibit C** attached hereto.

23.    Dr. Barrick signed and submitted the Application to Arcola with the intent to deceive Arcola into relying on the contents of the Application and thereby cause Arcola to originate the Arcola Loan and disburse the Arcola Loan proceeds (which Dr. Barrick had no intention of repaying).

24.    Arcola originated the Arcola Loan and disbursed the Arcola Loan proceeds—the **"Closing"**—about July 18, 2008. The Borrowers' duties under the Arcola Loan—including promises to pay principal, interest and other amounts—are evidenced by a promissory note (the **"Arcola Note"**), the Arcola Mortgage, and related documents, each signed by each Borrower respectively (collectively, the **"Arcola Loan Documents"**). A copy of the Arcola Note is attached as **Exhibit D**. Dr. Barrick, Collins, and White are each co-makers of the Arcola Note, and each is therefore jointly and severally liable to Arcola for payment and performance under the Arcola Loan Documents.

25.    Collins and White each signed the Arcola Loan Documents at different times, and a different place, than Dr. Barrick. Dr. Barrick signed the Arcola Loan Documents at his then current place of employment – Alexian Brothers Hospital in Elmhurst, Illinois.

26.    Although he agreed to provide the Property as collateral for the Arcola Loan, because Dr. Barrick was not seized with an interest in the Property and was required to hold an interest pursuant to the Arcola Loan Documents, Dr. Barrick had Collins and White transfer a 1/3 undivided interest as tenant-in-common in the Property

5

to him by quit claim deed. Dr. Barrick provided no consideration to Collins or White for that quit claim deed.

27. After the Closing, the Arcola Mortgage was recorded among the official records of Jo Daviess County, Illinois on August 21, 2008.

**Diversion and Dissipation of Arcola Loan Proceeds**

28. Arcola originated the Arcola Loan and disbursed the Arcola Loan proceeds expecting that Arcola would hold the most senior mortgage against the Property.

29. At the time of the Closing, Dr. Barrick knew that there were two other mortgages against the Property: one mortgage to Premier Bank (the **"Premier Mortgage"**) securing a loan of about $82,145 and another mortgage to the First Community Bank of Galena (**"First Galena"** and that mortgage, the **"First Galena Mortgage "**) securing a loan with an original principal amount of $355,000.

30. Part of the Arcola Loan proceeds were disbursed from the Closing to Premier Bank, satisfying the loan from Premier Bank and prompting Premier Bank to release the Premier Mortgage.

31. But Arcola Loan Proceeds were not paid to the First Community Bank of Galena, so the loan from the First Galena was *not* satisfied and the First Galena Mortgage was *not* released.

32. Arcola was *not* aware that after the Closing the First Galena Mortgage would continue to encumber the property, and because the First Galena Mortgage was recorded before the Arcola Mortgage, that the First Galena Mortgage was senior to the Arcola Mortgage. Arcola was unaware because the First Galena Mortgage was not identified in the Schedule B exceptions from coverage in the lenders policy of title insurance

6

and the commitment for same that were issued to Arcola and insuring the attachment, perfection, and seniority of the Arcola Mortgage.

33.    To conceal the First Galena Mortgage from Arcola, Dr. Barrick collaborated in efforts to ensure that a closing agent processing the Closing stopped the sending of a payoff check to First Galena as shown by a Closing disbursement statement that shows a voiding of a check payable to First Galena. That disbursement statement is attached as **Exhibit E** to this complaint

34.    Had the First Galena loan been satisfied, the Arcola Loan proceeds disbursed from the Closing to, or for the benefit of, Dr. Barrick would have been reduced by the amount paid to satisfy the First Galena loan: about $$153,000. And because the First Galena loan was not satisfied, the amount outstanding under that loan, and secured by the First Galena Mortgage, continued to increase.

35.    From the Closing, the Arcola Loan Proceeds due to the Borrowers—including Dr. Barrick—were wired to one of Dr. Barrick's accounts at Harris Bank (the **"Harris Bank Account"**).  *See* **Exhibit F**.

36.    No Arcola Loan Proceeds went from the Closing directly to Collins or White.

37.    At various times after Arcola Loan proceeds were wired into the Harris Bank Account, Dr. Barrick transferred those proceeds from the Harris Bank Account.

38.    Dr. Barrick *cannot* sufficiently explain where, or to whom, those proceeds were transferred to from the Harris Bank Account. And he cannot explain why those proceeds were transferred.

7

39. Consequently, Dr. Barrick *cannot* explain how he dissipated over $500,000 and is now unable to pay his obligations.

**The Payment History on the Loan and the Galena Bank Mortgage**

40. Initially, DiBenedetto, *not* Dr. Barrick or any of the other Borrowers, made payments of the Arcola Loan.

41. DiBenedetto made aggregated bulk payments under one check to pay Arcola for service debt under multiple loans to multiple and unrelated borrowers (each unrelated to the Borrowers). Arcola then had to allocate the payment among the various loans.

42. Around February 17, 2010, Arcola sent a letter to Dr. Barrick stating that Arcola would no longer accept payments on account of the Arcola Loan from DiBenedetto or any other third-party without a copy of a formal, written, agreement identifying the nature of the relationship between the Dr. Barrick and the paying third-party, the responsibilities of the third-party, and Dr. Barrick's the authorization for the third party to act on Dr. Barrick's behalf. A copy of that letter is attached as **Exhibit G** to this complaint. Dr. Barrick never provided that information or authorization to Arcola because he did not care whether the Arcola Loan was repaid.

43. Once Arcola stopped accepting the aggregated bulk payments from DiBenedetto, Dr. Barrick and the other Borrowers made no payments under the Arcola Loan.

44. Dr. Barrick's failure to make any payments under the Arcola Loan reinforce the notion that he signed the Arcola Loan Documents with no intent to repay the Arcola Loan. His failure to pay instead suggests that Dr. Barrick expected DiBenedetto, or the other Borrowers, to repay the Arcola Loan, though Dr. Barrick received all of the

8

Arcola Loan proceeds not devoted to paying "closing" costs and some, but not all—critically the First Galena loan—of the debt secured by the Property before the Closing.

45. Because Arcola would no longer accept payment from third parties, the Arcola Loan went into default beginning in April 2010.

46. Currently, the amount outstanding on the Arcola Loan is approximately $716,525.08, plus accruing interest, protective advances, and legal service fees, and costs.

47. Dr. Barrick did not make payments on the Arcola Loan, and neither he, nor anyone else, made any payments after the Closing on the First Galena loan. After First Galena sent notices of default to Collins and White, First Galena sued to foreclose the First Galena Mortgage against the Property and the—junior—Arcola Mortgage (the **"First Galena Litigation"**).

48. First Galena received a judgment of foreclosure against the Property and the Arcola Mortgage.

49. To avert First Galena foreclosing-out the Mortgage, Arcola purchased the First Galena loan—including the First Galena Mortgage and judgment of foreclosure in the First Galena Litigation, for $155,900.81 (the **"Protective Advance"**). *See* **Exhibits H** and **I.**

50. The Protective Advance increased the amount due from Dr. Barrick under the Arcola Loan by $155,900.81, plus interest, costs, and fees.

51. The current amount outstanding under the First Galena loan is now approximately $189,423.37, plus accruing interest, legal service fees, and costs. Neither Dr. Barrick, nor anyone else, has paid this money to Arcola or the Receiver.

**The Arcola Loan to Thomas Vann**

52. At Dr. Barrick's behest, Thomas Vann (**"Vann"**) borrowed $600,000 from Arcola and signed loan documents, including a promissory note payable to Arcola in the principal amount of $600,000 and a mortgage against real estate in Chicago to secure payment and performance under that loan. The Vann loan was funded on or about December 16, 2008.

53. The proceeds of the Vann loan, less closing costs--$497,245.15—were disbursed by check payable to the order of Vann. That check was endorsed to be payable to the order of Dr. Barrick, and deposited into *Dr. Barrick's* Harris Bank Account. *See* **Exhibit J.**

54. Despite receiving the Vann loan proceeds, Dr. Barrick was not entitled to them.

55. Although he received the proceeds of the Vann loan, Dr. Barrick had no intention of repaying the Vann loan; he never made even one payment under the Vann loan.

**The Receiver**

56. Before Dr. Barrick filed of his bankruptcy petition, the Receiver tried to collect from Dr. Barrick under the Arcola Loan and the First Galena loan.

**Dr. Barrick's Rule 2004 Examination and Dr. Barrick's Document Production**

57. Dr. Barrick defrauded not only Arcola, he defrauded his mother—Collins—and White too. Consequently—as a co-borrower under the Arcola Loan without

10

the ability to service the debt to Arcola herself—Collins filed the Chapter 11 petition mentioned above.

58. Dr. Barrick produced documents and testified under a Rule 2004 examination in Collins's bankruptcy. Dr. Barrick produced only part of his bank statements. Many of the omitted bank statements were for periods affecting the disbursement and transfer of proceeds from the Arcola Loan and the Vann loan, as well as periods when payments were due, but not paid, to Arcola.

59. Because those documents were not provided, the Receiver and other creditors, are not able to determine what happened to the money that Dr. Barrick received either directly or indirectly from Arcola under the Arcola Loan or the Vann loan. Similarly, no one can identify why Dr. Barrick is now unable to pay the debts he identified in Schedules and Statements of Financial Affairs he has filed in his bankruptcy case. After receiving over $1,000,000 in cash, Dr. Barrick should be able to pay those debts.

60. And when testifying at the Rule 2004 examination in Collins's bankruptcy case, Dr. Barrick invoked his Fifth Amendment privilege against self-incrimination to refuse to answer all of the substantive questions asked of him, particularly questions about applying for, origination of, disbursement of proceeds from, and repayment of, the Arcola Loan. The transcript of his testimony is attached as **Exhibit K** to this complaint.

## COUNT I
### (11 U.S.C. §523(a)(2)(A))

61. The Receiver incorporates by reference paragraphs 1 through 60 of this complaint as if fully restated in this paragraph.

62. Dr. Barrick's debt to Arcola, and now the Receiver as Arcola's involuntary successor, arises for money, property, services, or an extension, renewal, or refinancing

of credit obtained by false pretenses, a false representation, or actual fraud other than a statement respecting the debtor's or an insider's financial condition.

63. By facilitating Vann's receipt of the Vann loan proceeds from Arcola and then converting those proceeds to his own use, Barrick defrauded Arcola, and by application, the Receiver.

64. Dr. Barrick converted the proceeds with no intention of repaying Arcola.

65. Additionally, Dr. Barrick's conduct in connection with the Vann loan constitutes his making a loan with Arcola under false pretenses – that the recipient of the loan proceeds and obligor on the Vann loan would be Vann.

66. Dr. Barrick's conduct renders his debts to the Receiver nondischargeable under 11 U.S.C. §523(a)(2)(A).

The Receiver requests that this court render an order finding Dr. Barrick's debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A) in an amount to be determined at trial, and for such further and other relief as this court deems just and equitable.

## COUNT II
## (11 U.S.C. §523(a)(2)(B))

67. The Receiver incorporates by reference paragraphs 1 through 60 of this complaint as if fully restated in this paragraph.

68. Dr. Barrick's debt to Arcola, and now the Receiver as Arcola's involuntary successor, arises for money, property, services, or an extension, renewal, or refinancing of credit obtained by the use of a writing:

> (i)  that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;

12

>   (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>   (iv) that the debtor caused to be made or published with intent to deceive.

69. Dr. Barrick provided the Application to Arcola to induce it to make a loan to him and the other Borrowers.

70. The Application was materially false with respect to Dr. Barrick's financial position.

71. Arcola reasonably relied upon the Application, unaware that it was materially false.

72. Dr. Barrick provided the Application to Arcola with the intent to deceive it with respect to his ability to repay the Arcola Loan.

73. Dr. Barrick's conduct renders his debts to Receiver nondischargeable under 11 U.S.C. §523(a)(2)(B).

The Receiver requests that this court render an order finding Dr. Barrick's debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(B) in an amount to be determined at trial, and for such further and other relief as this court deems just and equitable.

## COUNT III
## (11 U.S.C. §523(a)(4))

74. The Receiver incorporates by reference paragraphs 1 through 60 of this complaint as if fully restated in this paragraph.

75. Dr. Barrick received money from Arcola through at least one scheme to engage in larceny as articulated above.

76. Dr. Barrick coordinated a grand scheme to steal money from Arcola as articulated above.

13

77. By facilitating the Vann loan through Arcola, Dr. Barrick engaged in larcenous conduct. Dr. Barrick intended to receive the proceeds of the Vann loan and used Vann as an artifice to secure the loan from Arcola.

78. Dr. Barrick's scheming renders his debts to the Receiver nondischargeable under 11 U.S.C. §523(a)(4).

The Receiver requests that this court render an order finding Dr. Barrick's debt to be nondischargeable under 11 U.S.C. § 523(a)(4) in an amount to be determined at trial, and for such further and other relief as this court deems just and equitable.

## COUNT IV
## 11 U.S.C. §727(a)(3)

79. Receiver incorporates by reference paragraphs 1 through 60 of his complaint as if fully restated in this paragraph.

80. Dr. Barrick's actions, including those articulated above, show that he has concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which the his financial condition, or business transactions, might be ascertained, unless such act, or failure to act, was justified under all of the circumstances of the case.

81. Specifically, in response to the Rule 2004 examination of Dr. Barrick in Collins's bankruptcy case, he failed to produce all of his bank statements. Those bank statements would evidence where the proceeds of the Arcola Loan and the Vann loan were respectively distributed after Dr. Barrick received them. Such information would also allow the Receiver to determine Dr. Barrick's financial position. For example, such funds could have been loans to third-parties or insiders that Dr. Barrick's the estate may

be able recover. But the destruction, or failure to produce, that information, prevents the Receiver from determining Dr. Barrick's financial position.

82. Dr. Barrick's failure to keep the proper records was not justified.

83. Dr. Barrick's conduct should bar his discharge under 11 U.S.C. §727 (a)(3).

The Receiver requests that this court render an order barring Dr. Barrick's discharge under 11 U.S.C. §727 (a)(3) and for such further and other relief as this court deems just and equitable.

## COUNT V
## (11 U.S.C. §727(a)(5))

84. Receiver incorporates by reference paragraphs 1 through 60 of this complaint as if fully restated in this paragraph.

85. Dr. Barrick has failed to explain satisfactorily, before determination of denial of discharge, any loss of assets or deficiency of assets to meet the his liabilities.

86. Dr. Barrick is unable to explain where the respective proceeds of the Arcola Loan and the Vann loan—together exceeding $1 million—have gone, despite his possession of both, and why he has such large debts after he received those loan proceeds.

87. Dr. Barrick did not explain at his meeting of creditors where the Arcola Loan proceeds were disbursed. Further, Dr. Barrick did not explain where the proceeds of the Vann loan were disbursed.

88. Dr. Barrick's conduct should bar his discharge under 11 U.S.C. §727 (a)(5).

15

The Receiver requests that this court render an order barring Dr. Barrick's discharge under 11 U.S.C. §727 (a)(5) and for such further and other relief as this court deems just and equitable.

**FEDERAL DEPOSIT INSURANCE CORPORATION**

By: /s/ Jeffrey L. Gansberg
One of its Attorneys

Jeffrey L. Gansberg (ARDC #06242943)
Much Shelist, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
PH: (312) 521-2000
Fax: (312) 521-2100
jgansberg@muchshelist.com